## AFFIDAVIT OF NICHOLAS J. IANNONE

I, Nicholas J. Iannone, being duly sworn, depose and state under oath as follows:

## INTRODUCTION

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed as a United States Postal Inspector since April 2023 and am currently assigned to the USPIS-sponsored Regional Interdiction Investigation Drug Enforcement Task Force (hereinafter RIIDE-TF), which is charged with responsibility to investigate, arrest, and dismantle drug trafficking networks and to utilize intelligence to target and seize dangerous drugs affecting the citizens of Massachusetts. Prior to my tenure with USPIS, I was a Special Agent with the United States Postal Service ("USPS"), Office of Inspector General.

2.      Since August 2023, I, along with other law enforcement agents, have been investigating ANTHONY DELGIUDICE ("DELGIUDICE") of 34 Crystal Way, Bellingham MA 02019 (the "Target Location") and other criminal associates yet-unidentified and/or yet-unknown concerning violations of federal law, including conspiracy to possess with intent to distribute controlled substances and distribution of controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1)(C) (collectively, the "Target Offenses"). In addition, the investigation includes DELGIUDICE's distribution of controlled substances related to money laundering violations.

3.      In connection with this investigation, I previously submitted an affidavit in support of an application for search warrant for a package addressed to DELGIUDICE at the Target

Location.  This application was approved on April 12, 2024, by the Honorable Magistrate Judge Jennifer C. Boal (24-MJ-7184-JCB) and the supporting affidavit is attached to this application as Exhibit 1 and is incorporated herein by reference. In that affidavit, I detailed my education, knowledge, training, and experience concerning drug investigations and the activities of individuals involved in drug trafficking. My background has not changed since I executed that affidavit.

4.    As outlined in more detail below, during the course of this investigation, DELGIUDICE has mailed hundreds of packages at post offices in the Bellingham and Mendon area. Several of the packages sent by DELGIUDICE have been found to contain tramadol, a Schedule IV controlled substance.  In addition, DELGIUDICE has received at the Target Location or been the listed recipient at the Target Location of several packages mailed by other individuals containing or believed to controlled substances, namely tramadol, fentanyl, or fentanyl analog. These mailings by and to DELGIUDICE are discussed in more detail in the affidavit I submitted in support of an application to extend the authorization for a GPS tracker warrant on DELGIUDICE's vehicle, a Black 2012 Cadillac SRX bearing Massachusetts Registration 5CRZ98, and vehicle identification number 3GYFNFE39CS541248 (the "Black Cadillac") (23-MJ-6510-MPK), which is attached as Exhibit 2 and incorporated by reference.

### PURPOSE OF AFFIDAVIT

5.    I submit this affidavit in support of:

        A. A criminal complaint against Anthony DELGIUDICE. charging that beginning at least in or about February 2022 and continuing through at least June 25, 2024, DELGIUDICE did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and to distribute tramadol, a Schedule IV controlled substance, and fentanyl, a Schedule I controlled

substance in violation of 21 U.S.C. Sections 846 and 841 (the "Target Offenses"); and

B. An application for a search warrant for the premises located at 34 Crystal Way, Bellingham, MA 02019 (the "Target Location"), which is the residence of DELGIUDICE, including all computers and cellular telephones, located therein belonging to and/or used by DELGIUDICE (the "Target Electronics"). These include, but are not limited to, two Apple iPhone 14 Pro Max devices, used by DELGIUDICE, one associated with telephone number 508-530-8690 (IMEI: 35782828308341) and one associated with telephone number 508-446-4372 (IMEI: 35787943611643). The Target Location is further described in Attachment A. The items to be searched for and seized at the Target Location and on the Target Electronics are described in Attachment B.

6.      As described below, there is probable cause to believe that DELGIUDICE: (a) has committed, is committing, and will continue to commit violations of one or more statutes cited above; and (b) uses the Target Location and the Target Electronics in furtherance of his drug trafficking activities and, consequently, in the commission of the Target Offenses. For this reason, probable cause exists to believe that evidence of the Target Offenses will be located at the Target Location and on the Target Electronics.

7.      I am personally involved in this investigation and am familiar with the facts and circumstances concerning it. I have received information from a variety of sources, such as my own personal observations, surveillance, videos, USPS records, data obtained from a court-authorized GPS tracker on DELGIUDICE's vehicle, the Black Cadillac, my review of records and information obtained through a variety of databases, and information provided to me by other law enforcement officers and personnel.

8.      Because I am submitting this affidavit for the limited purpose of securing the requested criminal complaint and search warrant, I have not included every fact known by me or other law enforcement investigators concerning this investigation. I have set forth only the facts

that I believe are necessary to establish the foundation for the criminal complaint and search warrant.

## PROBABLE CAUSE

### Background of Investigation

9.      As described in Exhibit 1 (attached and incorporated by reference), through physical surveillance, review of USPS videos, USPS records, and data obtained from a court-authorized GPS tracker on DELGIUDICE's car, the Black Cadillac, I have determined that DELGIUDICE[1] made frequent trips from the Target Location to the Mendon and Bellingham Post Offices, where, between October 2023 and April 2024, he has mailed hundreds of packages to addresses throughout the United States. Surveillance videos from the Mendon Post Office, which include footage from both inside and outside the post office, record many of DELGIUDICE's mailings.  On each of these visits, DELGIUDICE arrives driving the Black Cadillac, takes multiple packages out of the vehicle, and mails the packages at the Post Office retail counter. On several videos, DELGIUDICE can be seen checking his phone, writing addresses, and purchasing more packaging supplies, including envelopes and bubble wrap.  My review of postal business records containing images of the address labels of these parcels reveals that the parcels mailed by DELGIUDICE bear the fictitious handwritten return address "Tony Dell 50 Circus Ln Medway, MA 02053."

---

[1] I was able to identify DELGIUDICE by comparing his appearance to an image of his Massachusetts driver's license, obtained from the Massachusetts Registry of Motor Vehicles ("RMV").

**Mailings by DELGIUDICE found or suspected to contain controlled substances**

10.     The mailings by DELGIUDICE found or suspected to contain controlled substances include the following:

A.    **September 2023**: A priority flat rate envelope was ordered from an online vendor as part of an undercover investigation by United States Postal Inspectors assigned to the Spokane, WA office. This package, with the handwritten return address "Tony Dell 50 Circus Ln Medway, MA 02053," arrived on September 16, 2023, and contained approximately 35.84 grams of pink pills. A randomly-selected tablet was analyzed and was found to contain tramadol. Postal business records show the parcel was shipped on September 14, 2023, from the Mendon, MA Post Office.

B.    **October 2023:** On October 16, 2023, pursuant to written consent from the recipient, USPIS opened USPS Priority Mail Parcel 9505 5104 1626 32684640 36, with the return address: "Tony Dell 50 Circus Lane Medway, MA 02053." The parcel was found to contain approximately 39 grams of round pink pills that field tested positive for Tramadol.[2]

C.    **November 2023**:    On November 2, 2023, investigators followed DELGIUDICE as he drove the Black Cadillac from the Target Location to the Bellingham Post Office. Investigators watched DELGIUDICE enter the post office with a package in his hand. I retrieved the package mailed by DELGIUDICE, which bore the handwritten return address "Tony Dell 50 Circus Ln Medway, MA 02053." When opened pursuant to a search warrant (23-MJ-8322-PGL), this package was found to contain approximately 48.5 grams of pink pills, which field-tested positive for tramadol.

D.    **May 2024**: Approximately 20.8 grams of yellow oblong pills, marked "E712" and "10/325" were concealed inside USPS Priority parcel 9505 5124 4667 4120 8278 48.  The package bore the handwritten return address "Tony Dell 50 Circus Ln Medway, MA 02053." A random tablet was analyzed and found to contain fluorofentanyl (isomer not determined) and tramadol.

---

[2] These pills have been sent to the USPIS lab for testing, but no final result has yet been received.

**Packages addressed to DELGIUDICE  at the Target Location containing or suspected to contain controlled substances**

11.     My review of records from USPS and the Massachusetts RMV reveals that DELGIUDICE regularly receives mail at the Target Location, 34 Crystal Way, Bellingham, MA, 02019, and lists that address as his residence on his driver's license. Based on my training and experience, as well as information obtained during this investigation (including the large amounts of suspected narcotics contained in several of the shipments), I believe that these controlled substances are supplied to DELGIUDICE by other individuals involved in the conspiracy for the purpose of redistribution by DELGIUDICE. Packages addressed to DELGIUDICE[3] at the Target Location containing or suspected to contain narcotics include the following:

A. **August 2023**: On August 14, 2023, Magistrate Judge M. Page Kelley authorized a search warrant for a USPS Priority Package bearing tracking number 9505 5138 1258 3220 2082 72 (23-MJ-6382-MPK). This package was addressed to "Anthony D. 34 Crysta [sic] Way Bellingham, Massachusetts 02019." When opened pursuant to the search warrant, the package was found to contain approximately 5,172.5 grams of pink-colored pills. These pills field-tested positive for tramadol.

B. **December 2023**: A parcel was sent via USPS Ground Advantage bearing tracking number 9434 6112 0621 0429 2017 35, with a label indicating that the mailer was "Gerardo Cordero 12114 Royal Woods Dr El Paso, TX 79936" and the intended recipient was "Anthony D 39 Crystal Way Bellingham, MA 02019."[5] This package weighed approximately 11 pounds (4,990 grams).  On December 21, 2023, I was able to view the parcel before it was delivered by USPS. The parcel was damaged

---

[3] As noted in text, some of these packages were addressed to "Tony D" or "Anthony D." There are no USPS records of any individual other than DELGIUDICE with the first name "Tony" or "Anthony" receiving mail at the Target Location.  In addition, as noted above, DELGIUDICE regularly mails packages with the sender's name listed as "Tony Dell."  Therefore, and given the fact that "Tony" is a common nickname for "Anthony," I believe that the packages addressed to "Tony D." and "Anthony D." are intended for DELGIUDICE.

[5] While the typed recipient address read "39 Crystal Way," the handwritten address from which the typed label was generated was poorly formed and the final numeral could be interpreted as either a "9" or a "4." As noted in text, the package was delivered to the Target Location, 34 Crystal Way, and was picked up by DELGIUDICE.

and poorly packaged, with ripped tape. As a result, when the parcel was taken out of the mail truck and the ripped tape was examined, the contents of the parcel were clearly visible, and I could see that it contained numerous blister packs of pills that appeared to be labelled "tramadol."  This parcel was delivered to the front steps of the Target Location, and I observed DELGIUDICE exit the Target Location, pick up the parcel, and bring it inside the Target Location.

C.  **January 2024**: On January 16, 2024, USPS business records show DELGIUDICE received a USPS priority parcel bearing tracking number 9505516331434011993062, which was sent from San Diego, CA to 34 Crystal Way, Bellingham, Massachusetts. This parcel weighed approximately 13.4 pounds, and the payment for the shipment was made in cash. This parcel is similar in description to the above-referenced parcel that was opened pursuant to a search warrant (23-MJ-6382-MPK), which was found to contain 5,172.5 grams of tramadol.

D.  **February 2024:** By reviewing USPS records, I learned that a package had been mailed on February 23, 2024. The handwritten label on this package indicated that the intended recipient was "Anthony Delgiudice 34 Cristal [sic] Way Bellingham, Massachusetts 02019." When this package was opened pursuant to a court-authorized search warrant (24-MJ-6169-MPK), it was found to contain approximately 91 oblong yellow tablets, weighing, in total approximately 44.5 grams. A random sample tablet was analyzed by the USPS laboratory and was found to contain para-fluorofentanyl, a synthetic fentanyl analog.

E.  **February 2024**: a package addressed to "Anthony Delgiudice, 34 Crystal Way, Bellingham, MA 02019" was seized as part of a separate investigation. The parcel addressed to DELGIUDICE contained approximately 45.4 grams of yellow tablets. Investigators packaged these yellow tablets with similar yellow tablets found in the other parcels in the possession of the individual arrested. These yellow tablets were then sent to the DEA Laboratory. Nine random pills were examined from this combined exhibit, and all nine were found to contain para-fluorofentanyl.

F.  **June 2024:** I have identified two additional packages addressed to DELGIUDICE at the Target Location and have removed them from the mail stream for further investigation.  The first package bears tracking number 9405 5112 0620 4781 7380 30, weighs approximately 3.2 ounces (90.7 grams), and has a printed return address of "Wilmington Acevedo 2256 Liden Blvd Apt 2B Brooklyn, NY 11208."  In an attempt to identify the sender of this package, I consulted the Thomson Reuters CLEAR investigative database.[6] According to this database, the name listed on the return address label, "Wilmington Acevedo," is not associated with the return

---

[6] CLEAR is an investigative tool that allows law enforcement real time access to multiple databases of public and proprietary records.

address on the label, "2256 Liden Blvd Apt 2B Brooklyn, NY 11208." On June 20, 2024, after I had removed the package from the mail stream, DELGIUDICE sent an email to USPS customer support inquiring, "where the hell is my package."

The second package, also addressed to DELGIUDICE at the Target Location, bears tracking number 9405 5112 0620 4777 3109 67, weighs approximately 3.6 ounces (102 grams), and has the printed return address "Brianna Biles 5404 Avenue N Brooklyn, NY 11234." According to the CLEAR database, the name "Brianna Biles" is not associated with the address of "5404 Avenue N Brooklyn, NY 11234." Both packages are currently secured at the USPIS office within the Franklin, MA Post Office located at 43 Main Street Franklin, MA 02038.

**Online financial transactions by DELGIUDICE relating to the distribution of controlled substances**

12.     The investigation has also revealed that DELGIUDICE has received payments for controlled substances apparently shipped by other members of the organization, coordinating the shipments of controlled substances and payments for those controlled substances with co-conspirators. Financial records obtained via grand jury subpoena and bank records show that, between August 2023 and January 2024, DELGIUDICE received 20 payments via CashApp from an individual named Amy Zolak, totaling approximately $16,420. During this time, there was also one CashApp payment of $1,175 from DELGIUDICE to Zolak (likely a refund of a duplicate payment by ZOLAK), resulting in a total net transfer of $15,245 from Zolak to DELGIUDICE. Zolak has stated that these payments to DELGIUDICE were for Ambien, a Schedule IV controlled substance. I have been unable to identify any packages shipped by DELGIUDICE to Zolak during the relevant time frame. Based on my training and experience, as well as information developed during this investigation and described in more detail below, I believe that these transfers from Zolak to DELGIUDICE represented payments for controlled substances shipped by another member of the drug trafficking organization. Based on my training and experience, this separation

of payments from drug shipments is often indicative of an extensive and sophisticated drug distribution organization.

13.     Information received via grand jury subpoenas has also revealed that DELGIUDICE has several accounts with the peer-to-peer payment processing companies, including Block Inc. (the owner of the CashApp application) and Early Warning Services (Zelle). Between February 25, 2022 and December 26, 2023, DELGIUDICE received over 300 peer-to-peer payments via CashApp totaling approximately $144,735. Many of the transactions have empty subject lines.  However, 45 of these transactions have a subject line added by the sender, apparently characterizing the transaction. These subject lines include "Medicine," "medication," "meds," "medical," "health," "T," "Stuff", and "the usual."

14.     From January 2022 through January 2024, DELGIUDICE received more than 350 Zelle peer-to-peer payments (more than 400 attempted) directly into several bank accounts held by DELGIUDICE at multiple financial institutions.  The cumulative total of successfully delivered Zelle payments over this period of time was approximately $151,165. Like the CashApp transactions, most payments did not include sender-added information characterizing the transaction.  However, a number of the transactions appear to note the subject matter of the transaction, including notes such as: "Medication," "Tablets," "Ambien," "Ambien-180 pills," "For immediate delivery of 180 items," or "Order Anthony."

15.     Based on my training and experience regarding the ways in which narcotics traffickers structure their organizations and conduct their business, I know that, in some cases, the individual who receives the payment for the drugs that are shipped is a different individual than the person who mails the packages containing the drugs. This splitting of responsibilities for

shipping packages and receiving payments is intended to make law enforcement detection of the distribution network more difficult, by establishing a separation between the outgoing controlled substances and the incoming money.  It is also, as noted above, often indicative of a broad and sophisticated drug distribution organization.

16.     In addition, as part of the current investigation, I have learned that payment for the September 2023 package of tramadol (referenced in paragraph 10 above) supplied by DELGIUDICE was sent, not to DELGIUDICE, but to a different individual.  As described above, the September 2023 package was mailed by DELGIUDICE in response to an online undercover order in a separate investigation. The online vender directed the undercover purchaser to pay for the tramadol via the payment application CashApp, with the payment directed to the user "$diamond151red," the CashApp username (or "CashTag") of an individual identified as Aaron MCCOOL who lists an address of 3005 Grays Ferry Avenue Suite 32095 Philadelphia, PA. However, the undercover Inspector asked if, instead of using CashApp, the payment for the tramadol could be made via the cryptocurrency Bitcoin. The vendor agreed and directed the inspector to pay $269 in bitcoin to a specified Bitcoin wallet. USPIS analysts traced this payment, finding that it ultimately went to a Binance.com account held by an individual identified as KAMLESH SHARMA. SHARMA lists a home address in India.  However, as described above, the tramadol sent in response to this online undercover order, was shipped by DELGIUDICE, bearing the handwritten return address "Tony Dell 50 Circus Ln Medway, MA 02053."

17.     Based on these facts, and on my training and experience, I believe that this pattern of financial transactions strongly suggests that DELGIUDICE's distribution of controlled

substances is part of a large, international organization, involving the online coordination of payments and narcotics shipments by a number of co-conspirators.

**The Target Location -- DELGIUDICE's residence**.

18.     The Target Location is the premises located at 34 Crystal Way, Bellingham MA 02019, a three-level single-family, attached, townhome-style condominium located in Crystal Springs Condominium Complex in the town of Bellingham, MA. The exterior of the Target Location is light tan. The front door is white, with the number 34 displayed to the right of the front door when facing the Target Location from Crystal Way. A detailed description and photograph of the Target Location is provided in Attachment A-1, which is attached and incorporated herein.

19.     The Target Location is DELGIUDICE's residence.    As noted above, DELGIUDICE regularly receives mail at the Target Location, the Target Location is listed as DELGIUDICE's residence on his driver's license, and, during surveillance by law enforcement, the Black Cadillac registered to DELGIUDICE at the Target Location has been consistently seen parked in front of the Target Location.

**DRUG TRAFFICKERS' USE OF RESIDENCES AND CELL PHONES/COMPUTERS**

20.     Based on my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug traffickers' residences and locations of operation:

    a.  Controlled substances.

    b.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers, or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passports; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry, precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments, or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.  Airbills, labels for USPS and other common carriers, receipts and other documents pertaining to such shipments.

h.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental, agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of co-conspirators.

12

j.   Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

21.   Based upon my training and experience, as well as the training and experience of other law enforcement agents with whom I have worked, I am aware that it is generally a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand in order to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.  As noted above, DELGIUDICE has sent hundreds of packages during the course of this investigation to individuals all over the United States and has been seen on video at the post office checking his phone and apparently writing addresses before mailing packages. DELGIUDICE's actions suggest that he maintains lists of names and addresses of drug customers on his cellular phone(s).

22.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence. Such documents include rental or storage property agreements and receipts.

23.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

24.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.  As noted above, since February 2022, DELGIUDICE has been receiving financial transfers via Block, Inc. accounts.

25.      Based upon my training and experience, as well as the training and experience of other law enforcement agents with whom I have worked, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money

laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

26.     Many drug dealers receive or distribute their drugs through USPS and other common carriers and keep mailing labels and airbills (both used and unused) in their residences for future use. Specifically, as described above, throughout the investigation, DELGIUDICE has mailed large numbers of packages, and has been seen at the post office obtaining additional packaging materials which, in my training and experience means that he is likely to use them for future mailings.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.  Records obtained from Western Union via grand jury subpoena have revealed that, between March 2021 and December 2023, DELGIUDICE wired approximately $89,258 via Western Union to individuals located in India.

27.     During the course of residential searches, other agents and I have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long

periods of time for several reasons, such as record keeping. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and can be helpful when attempting to flee police.

28.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. As described above, DELGIUDICE has been seen consulting his cellular phone at the post office, at the same time he was apparently addressing and mailing packages.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that many drug dealers use encrypted communication applications on their cellular telephones, such as WhatsApp and Signal, in an effort to avoid law enforcement electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records,

statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

29.     Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

30.     Search and seizure of devices containing this information will provide information relating to co-conspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other co-conspirators, and that they communicate via voice calls, email, and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records include contact lists of buyers and sellers, ledgers of sales and money owed by customers or to

suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

31.     I also know that many drug traffickers often use cellular telephones to communicate with their suppliers and customers via the internet and frequently use cellular telephones to create and store records of their actions by communicating with others through email, electronic messages, and updates to online social networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

32.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as

memory cards. I also know that such data can be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

    a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b.  Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. The device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only when replaced with more recently viewed Internet pages or if a user takes steps to delete them.

33.    The law enforcement agents will try to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B. If the law enforcement agents cannot determine the use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

34.    Based on the foregoing, there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment B will be found in the Target Location, as described in Attachment A, and on the Target Electronics.

**UNLOCKING A DEVICE USING BIOMETRIC FEATURES**

35.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.   Subscriber information obtained from cellular service providers indicates that DELGIUDICE appears to use two Apple iPhone 14 Pro Max devices, one associated with telephone number 508-530-8690 (IMEI: 35782828308341) and one associated with telephone number 508-446-4372 (IMEI: 35787943611643).

36.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

37.     The passcode that would unlock the Target Telephones is not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of  Target Telephones found during the search of the Target Location to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

38.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Location to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

39.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Target Location to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

21

## CONCLUSION

40.     Based upon the foregoing, there is probable cause to believe that (a) DELGIUDICE conspired to possess with intent to distribute and to distribute controlled substances, tramadol and fentanyl, in violation of Title 21, United States Code, Sections 846 and 841; (b) is committing, and will continue to commit the violations of the Target Offenses cited above; (c) the Target Location is being used to store and/or facilitate narcotics trafficking activities of a criminal organization in the District of Massachusetts; (d) the Target Electronics are being used in furtherance of these drug trafficking activities; and (e) the items seized during the search of the Target Location and/or the Target Electronics will constitute or lead to evidence, fruits, and instrumentalities of the Target Offenses.

I declare that the foregoing is true and correct.

/s/ Nicholas J. Iannone

_____
Nicholas J. Iannone
United States Postal Inspector

Subscribed and sworn to telephonically in accordance with Fed. R. Crim. P. 4.1
on June __, 2024.     June 26, 2024



_____
Honorable M. Page Kelley
United States Magistrate Judge
District of Massachusetts



22

## ATTACHMENT A

The property located at 34 Crystal Way, Bellingham MA 02019  ( the "Target Location") is a three-level single-family, attached, townhome-style condominium located in Crystal Springs Condominium Complex in the town of Bellingham, MA.   The exterior of the Target Location has vinyl siding, which is a light tan color, with white shutters and a bay window to the right of the front door when looking at the unit from Crystal Way. The front door is white and the number 34 is displayed to the right of the front door when facing the Target Location from Crystal Way.



**ATTACHMENT B**

All records and tangible objects, in whatever form, that constitute evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 846 and 841(a)(1) (collectively, the "Target Offenses"), including:

1.      Controlled substances, including but not limited to tramadol, fentanyl, fentanyl analog, and real or counterfeit oxycodone.

2.      Materials, equipment, and paraphernalia associated with the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, drug pressing machines, storage bins, containers, cutting agents, and scales.

3.      Documents containing data reflecting or memorializing the manufacturing, ordering, possession, purchase, storage, distribution, and/or transportation of controlled substances, including records of sales, records of purchases, log books, drug ledgers, wire transfer documents, personal telephone/address books containing the names of purchasers and suppliers of controlled substances used to manufacture controlled substances, electronic organizers, storage records, such as storage locker receipts and safety deposit box rental records and keys, telephone bills, bank and financial records, including, but not limited to:

        a.  Bank, credit union, investment, money transfer, and other financial accounts;
        b.  Credit and debit card accounts; and
        c.  Tax statements and returns.

4.      Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records,

utility bills and receipts, photographs, recordings, telephones, vehicle records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, and personal identification documents.

5.      Photographs and video and audio recordings which document an association with other coconspirators and/or which display controlled substances, firearms, or chemicals/materials used in the manufacturing of controlled substances.

6.      Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items.

7.      All documents, records, and other materials evidencing the shipping or receipt of packages to or from, including but not limited to, invoices, waybills, packaging materials, postage meters, FedEx boxes, UPS boxes, USPS boxes, shipping addresses, and account statements for accounts held at FedEx, UPS, the USPS, DHL, or other shipping companies.

8.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments, or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

9.      All documents evidencing or relating to foreign or domestic travel of  any co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent

flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms.

10.     Cell phones identified as used by or belonging to Anthony Delgiudice

11.     All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing narcotics trafficking and/or referencing individuals engaged in narcotics trafficking, located in the memory of any mobile telephone belonging to or identified as being used by, or any co-conspirators and described as the mobile telephone's:

      a.     Incoming call history;

      b.     Outgoing call history;

      c.     Missed call history;

      d.     Outgoing text messages;

      e.     Incoming text messages;

      f.     Draft text messages;

      g.     Telephone book;

      h.     Data screen or file identifying the telephone number associated with the mobile telephone searched;

      i.     Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

      j.     Voicemail;

      k.     User-entered messages (such as to-do lists);

l.      Browser messages and/or internet communications (*e.g.*, e-mail; text messages) both to and from the cellular telephone (including any in draft form) relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking;

m.      Photographs; and

n.      Any passwords used to access the electronic data described above.

12.      During the execution of the search of the Target Location described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the Target Location to the sensor of the subject device and/or to hold the device in front of their faces.

### RETURN OF SEIZED EQUIPMENT

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes. If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally identifying information of victims; or the fruits or instrumentalities of crime.